**Table of Contents**

I.    SUMMARY JUDGMENT STANDARD ................................................................ 1

II.   STATEMENT OF MATERIAL FACTS ............................................................... 2

III.  ARGUMENT AND ANALYSIS ........................................................................... 6

## Cases

*Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44 (1974) .................................................. 8

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986) ......................................... 1

*Bourque v. Powell Elec. Mfg. Co.,* 617 F.2d 61, 65 (5th Cir. 1980). ................................. 19

Brown v. Kinney Shoe Co., 237 F.3d 556, 566 (5th Cir.2001) ............................................ 19

*Credeur v. Louisiana Through Office of Attorney Gen.,* 860 F.3d 785, 797 (5th Cir. 2017)........... 12

*EEOC v. 5042 Holdings Ltd.*, 2010 WL 148085, at *1 (N.D.W. Va. Jan. 11, 2010) .................. 8

EEOC v. Allegheny Airlines, 436 F.Supp. 1300, 1304 (W.D.Pa.1977) ................................ 7

*EEOC v. Alliance, 866 F.Supp.2d 636 (W.D.Tex. 2011)* ................................................... 7

*EEOC v. Boh Bros.Const.,* 731 F.3d 444,464 (5th Cir. 2013) ............................................ 22

*EEOC v. Caterpillar, Inc.*, 409 F.3d 831, 833 (7th Cir. 2005) ......................................... 7, 8

EEOC v. General Elec. Co., 532 F.2d 359, 373 (4th Cir.1976) ............................................ 7

EEOC v. Gurnee Inn Corp., 914 F.2d 815, 819 n. 6 (7th Cir.1990) .................................... 7

*EEOC v. Huttig Sash & Door Co.*, 511 F.2d 453, 455 (5th Cir. 1975)................................... 9

*EEOC v. Kronos, Inc.*, 620 F.3d 287, 297 (3d Cir. 2010)................................................... 8

*EEOC v. Scott Med. Health Ctr., P.C.*, 217 F. Supp.3d 834, 837 (W.D. Pa. 2016) ............... 7

*EEOC v. Stone Pony Pizza, L.L.C.* 172 F.Supp.3d 941, 948 (N.D. Miss. 2016) ................. 7

*EEOC v. Waffle House, Inc.*, 534 U.S. 279, 286-88 (2002)................................................. 6

*EEOC v. Walmart Stores Inc.*, 154 F.3d 417 (5th Cir. 1998) ............................................. 6

*Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998) .............................................. 22

Faruki v. Parsons, 123 F.3d 315, 319 (5th Cir.1997)........................................................... 19

*Flowers v. S. Reg'l Physician Servs. Inc*., 247 F.3d 229, 235–36 (5th Cir. 2001) ................ 11

*Gen. Tel. Co. of the Northwest, Inc. v. EEOC*, 446 U.S. 318, 331 (1980)........................... 8

*Harris v. Amoco Production Co.,* 768 F.2d 669, 684-685 (5th Cir. 1985) ........................... 6

Harris, 510 U.S. at 21–22, 114 S.Ct. 367) ......................................................................... 17

*Hernandez v. Yellow Transp., Inc.,* 670 F.3d 644, 651 (5th Cir. 2012) ............................ 12

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 599 (1986)..................... 2

McConathy v. Dr. Pepper/Seven Up Corp., 131 F.3d 558, 563 (5th Cir. 1998).................. 11

*McConathy v. Dr. Pepper/Seven Up Corp.,* 131 F.3d 558, 563 (5th Cir.1998)................... 10

*Miller v. Pub. Storage Mgmt., Inc*., 121 F.3d 215, 218 (5th Cir. 1997)............................. 10

*Pa. State Police v. Suders,* 542 U.S. 129, 134 (2004)....................................................... 21

Price v. Sw. Bell Telephone Co., 687 F.2d 74, 78 (5th Cir.1982) ...................................... 9

*Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002) ................................................ 12

*Ramsey*, 286 F.3d at 268 ................................................................................................. 12

*Septimus v. Univ. of Houston*, 399 F.3d 601, 611 (5th Cir. 2005) (Title VII) .................... 12

Shepherd v. Comptroller of Pub. Accounts, 168 F.3d 871, 874 (5th Cir.1999) ................. 17

*Vance v. Ball State Unv.*, 570 U.S. 421, 453 (2013)........................................................ 21

Young v. City of Houston, 906 F.2d 177, 179 (5th Cir.1990) ............................................ 9

**Statutes**

42 USC § 2000e-5……………………………………………………………………………..6

**IN THE UNITED STATES DISTRICT
COURT FOR THE WESTERN DISTRICT
OF TEXAS EL PASO DIVISION**

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 3:21-cv-00232-FM** |
| | ) | |
| **U.S. DRUG MART INC. d/b/a FABENS PHARMACY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**EEOC'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW the Plaintiff, Equal Employment Opportunity Commission ("EEOC" or "Commission") files this Response in Opposition to Defendant's Motion for Summary Judgment. EEOC requests that this Court deny the Defendant's Motion for Summary Judgment.

## I.      SUMMARY JUDGMENT STANDARD

Summary judgment shall only be granted if there is "no genuine issue as to any material fact" which, by its terms, means that the "mere existence of some alleged factual dispute between the parties will not defeat...summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Factual disputes are material if the fact affects the outcome of the suit and genuine if a reasonable jury could return a verdict for the nonmoving party. Id. at 248. Facts are viewed in the light most favorable to the nonmoving party—EEOC in this case. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 599 (1986). All reasonable inferences or factual disputes are resolved in favor of the nonmoving party. *Groh v. Ramirez*, 540 U.S. 551,

562 (2004) (*citing Anderson*, 477 U.S. at 255). In evaluating a motion for summary judgment, courts "may not make credibility determinations or weigh the evidence" and "must resolve all ambiguities and draw all permissible inferences in favor of the non-moving party." *Total E & P USA Inc. v. Kerr–McGee Oil and Gas Corp.*, 719 F.3d 424, 434 (5th Cir. 2013) Because employment discrimination claims turn on questions of motivation and intent, summary judgment is rarely appropriate. *Thornbrough v. Columbus and Greenville R.R. Co.,* 760 F.2d 633, 640–41 (5th Cir. 1985).

## II.      STATEMENT OF MATERIAL FACTS

1.      David Calzada, Jr. filed EEOC Charge of Discrimination No. 450-2020-00820 on July 14, 2020.  (App. 00097)

2.      On April 26, 2021, the Commission issued to Defendant a Letter of Determination finding reasonable cause to believe that the Respondent "discriminated against the Charging Party because of his disability in violation of the ADA by denying him a reasonable accommodation and subjecting him to harassment because of his request for a reasonable accommodation, resulting in his constructive discharge." The Letter of Determination invited the Defendant to join with the Commission in informal methods of conciliation try and to eliminate the unlawful employment practices and provide appropriate relief. (App. 0098-0099)

3.      On April 26, 2021, EEOC investigator Jessie Moreno also had a telephone call with U.S. Drug Mart Chief Operating Officer David Paschal, where they discussed the nature of EEOC's reasonable cause findings in this case. (App. 0101)

4.      On June 1, 2021, Paschal interviewed two employees whom he later identified as Robert Primero and Sonya Aguirre, who were working in the pharmacy when the argument occurred between Pharmacist in Charge Steve Mosher, his wife Pharmacy Manager Ana Navarette and Calzada. Defendant provided EEOC with notes of the interviews, in which

Aguirre said Calzada showed her and Navarette his Pro Air Inhaler in approximately December 2018, saying he did not want them to think he stole it from the shelf. (App. 0063,0068,0068A-0069) (App. 100)

4.      In response to questions raised by counsel for Respondent, on June 10, 2021, EEOC Trial Attorney Joel Clark sent a letter to Respondent's counsel providing additional facts relating to the EEOC's reasonable cause findings in this case. (App. 102-103)

5.       The parties attempted conciliation of the charge of discrimination but were unable to reach a settlement. It is undisputed that on June 22, 2021, the EEOC issued a Failure of Conciliation Letter, finding that further conciliation efforts would not be productive.

6.      EEOC filed its Complaint on September 24, 2021 on behalf of David Calzada Jr., alleging that the Defendant violated the ADA by subjecting Calzada to a hostile work environment because of his disability, resulting in his constructive discharge. [Dkt. 1]

7.      Calzada was born on Dec. 25, 1999. Calzada has asthma. He was diagnosed with asthma when he was about 7 or 8 years old. (App. 0003-0004) He was 19-years-old at the time that he was hired to work for the Defendant. (App. 104)

8.      On August 28, 2018, Calzada began working at Fabens Pharmacy. He was hired as a Clerk. (App. 105)

9.      At the time he worked at Fabens, Calzada used albuterol sulfate and an inhaler to control the asthma symptoms, such as difficulty breathing, pain and pressure in his chest, shortness of breath and wheezing when exercising. (App. 0003-0005, 0008-0010)

10.      Calzada interviewed for the position with Ana Navarette and Steve Mosher. Navarette worked as the General Manager of Fabens Pharmacy. Mosher was the Pharmacist in Charge.  (App. 0006,0007) During Calzada's interview, he was very polite, not aggressive and

respectful of Mosher. (App. 0045)

11.      Calzada believed that both Navarette and Mosher were his supervisors. He understood that Mosher had the ability to fire him. (App. 0007)

12.      In fact, Navarette and Mosher conduct all hiring for the Pharmacy, including Clerks and Pharmacy Techs. They both interview the applicants together and decide together who should be hired. (App. 0040,0041) Both Navarette and Mosher discipline Clerks and Pharmacy Techs. Both Navarette and Mosher must sign any written disciplinary documents. (App. 0043,0044)

13.      During his interview with Navarette and Mosher for the position, Calzada testified that they asked about his medical history. He told Navarette and Mosher that he had asthma. (App. 0008)

14.      In Nov. 2019, Calzada received his license and became a Pharmacy Tech in Training. (App. 0046)

15.      Navarette and Mosher trained Calzada to perform his duties on the job. (App. 0047)

16.      On March 26, 2020, Calzada came to work with a facemask on because he was concerned about the impact of COVID because he has asthma. Navarette told him to take the mask off because David Paschal said he did not want the employees to wear a mask. (App. 0011)

17.      When Navarette told him to take the mask off, he told her it was for his health because he has asthma. (App. 0012)

18.      Navarette told Calzada that if he wanted to wear the facemask, he could clock out and go home or take the mask off and go back to work. (App. 0013) Calzada went home.

19.     Calzada came back to work on March 27, 2020. He talked to Senior Pharmacy tech Primero who told him that he would not be working that day, and that he needed to speak to Navarette or Mosher in order to clock in. (App.0013-0015)

20.     The Pharmacy was closed on Sunday, so Calzada returned to work on Monday, Mar. 30, 2020. When he returned to work, he asked to speak to Navarette and Mosher. (App. X, 0015-0017) Calzada recorded the conversation on his cellphone. (App. 0017, App. 0079-0096)

21.     The entire argument between Calzada, Navarette and Mosher was in the back of the pharmacy near Navarette's desk. (App. 0048) They did not move the conversation to the Office and close the door. It occurred out in the open while other employees arrived at work and clocked in. (App. 0049-0050)

22.     After the meeting, which is detailed on the Transcript and in deposition testimony attached to this briefing, Calzada felt that he was in a "scary situation" and that he had no other choice but to walk away from his position. (App. 0018-0021)

23.     Paschal admitted that Defendant has never required training in the pharmacies on anti-discrimination law. (App. 00064) Navarette also testified that she has not provided any training on the ADA to the employees in Fabens Pharmacy. (App. 0058) In fact, employees of US Drug Mart do not get any training on what constitutes discrimination based upon disability. (App. 0067)

24.     Paschal testified that there is no anti-discrimination policy contained in the Employee Handbook for the Defendant. (App. 0066)

### III.   ARGUMENT AND ANALYSIS

### A. DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES ARGUMENT

In its motion for summary judgment, Defendant argues that it is entitled to summary judgment because EEOC failed to exhaust administrative remedies, based upon the facts included by David Calzada Jr. in the Charge of Discrimination he filed with the EEOC. However, the law stands in contrast to Defendant's argument. The EEOC's lawsuit is not limited by the recitation of facts in Mr. Calzada's charge of discrimination. EEOC has independent statutory authority and responsibility to investigate and conciliate claims and ultimately to bring a civil action in federal court. 42 USC § 2000e-5; *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 286-88 (2002). It is well established that when the EEOC, rather than the individual Charging Party, is the named plaintiff in the case, the EEOC is not limited to the specific discrimination alleged in the Charge of Discrimination but instead may sue for any type of discrimination it uncovers during an investigation of the charge. *EEOC v. Walmart Stores Inc.*, 154 F.3d 417 (5th Cir. 1998). Under this rule, if a valid charge of discrimination is filed, the EEOC may bring a civil action encompassing any discrimination which is uncovered during a reasonable investigation of that charge. *Harris v. Amoco Production Co.,* 768 F.2d 669, 684-685 (5th Cir. 1985). *See also EEOC v. General Elec. Co.,* 532 F.2d 359, 373 (4th Cir.1976), *EEOC v. Gurnee Inn Corp.,* 914 F.2d 815, 819 n. 6 (7th Cir.1990) (a suit by the EEOC is not limited to the specific discrimination that the Charging Party has standing to raise); *EEOC v. Allegheny Airlines,* 436 F.Supp. 1300, 1304 (W.D.Pa.1977), *See also EEOC v. Alliance, 866 F.Supp.2d 636 (W.D.Tex. 2011)(*ADA case involving service of EEOC subpoena for company-wide documents. EEOC is not limited by the individual charge in conducting its investigation.)

The exhaustion of administrative remedies requirements cited by the Defendant does not apply to EEOC when the EEOC is the plaintiff. *EEOC v. Caterpillar, Inc.*, 409 F.3d 831, 833 (7th Cir. 2005); *EEOC v. Stone Pony Pizza, L.L.C.* 172 F.Supp.3d 941, 948 (N.D. Miss. 2016); *EEOC v. Scott Med. Health Ctr., P.C.*, 217 F. Supp.3d 834, 837 (W.D. Pa. 2016) (rejecting defendant employer's argument that administrative exhaustion requirements applicable to private litigants applies equally to EEOC suits); *EEOC v. 5042 Holdings Ltd.*, 2010 WL 148085, at *1 (N.D.W. Va. Jan. 11, 2010). The reason for this principle is obvious: The exhaustion of remedies doctrine exists to effectuate Title VII and the American with Disabilities Act's legislative purpose of ensuring that discrimination claims are first presented to the EEOC during administrative proceedings, creating the opportunity for informal resolution before judicial intervention. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44 (1974). But when it is EEOC acting as the plaintiff in bringing claims in litigation, then that purpose has already been served by the agency's pre-suit procedures. *EEOC v. Caterpillar, Inc.*, 409 F.3d 831, 833 (7th Cir. 2005).

It is well established that any violations that the EEOC ascertains in the course of a reasonable investigation of a charging party's complaint are actionable.  *Gen. Tel. Co. of the Northwest, Inc. v. EEOC*, 446 U.S. 318, 331 (1980) "Once the EEOC begins an investigation, it is not required to ignore facts that support additional claims of discrimination if it uncovers such evidence during the course of a reasonable investigation." *EEOC v. Kronos, Inc.*, 620 F.3d 287, 297 (3d Cir. 2010). And, as the Fifth Circuit has held, the original charge of discrimination provides EEOC with a "jurisdictional springboard" to investigate whether the employer is engaged in any discriminatory practices which investigation may well disclose, as in this instance, illegal practices other than those listed in the charge. *EEOC v. Huttig Sash & Door Co.*,

511 F.2d 453, 455 (5th Cir. 1975).

The Fifth Circuit has held that courts should "construe employment discrimination charges with the 'utmost liberality,'" given that most EEOC filings are not prepared by lawyers. *Price v. Sw. Bell Telephone Co.,* 687 F.2d 74, 78 (5th Cir.1982). The scope of a discrimination complaint is not "limited to the exact charge brought to the EEOC." *Young v. City of Houston,* 906 F.2d 177, 179 (5th Cir.1990). Here, the Charging Party, without the assistance of private counsel, filed an EEOC Charge of Discrimination. Then the EEOC conducted an investigation by gathering information from the Defendant and Mr. Calzada. The Commission issued a Letter of Determination on April 26, 2021. This Letter of Determination provided the Defendant with sufficient notice about the EEOC's findings relating to Calzada's disability and constructive discharge. Notably, the Letter of Determination specifically states:

> During the investigation, the parties were afforded the opportunity to submit evidence in support of their respective positions. The evidence shows that Charging Party was hired by the Respondent on or about August 2018 as a Clerk/Pharmacy Technician. The evidence further shows that the Charging Party made the Respondent aware of his disability and used his medication openly at the workplace. Additionally, the evidence establishes that on March 26, 2020, the Charging Party requested to wear a facemask as a reasonable accommodation because he was at high risk for COVID-19 because of his disability. The evidence also shows that EEOC Respondent's Manager and Head Pharmacist held a meeting with the Charging Party on March 30, 2020 where the Charging Party was told he could not wear a face mask. Charging Party also was threatened with termination multiple times during the meeting for his insistence on wearing a mask, and subjected to name-calling and cursing, thereby creating a hostile work environment. The evidence establishes that the Charging Party was threatened and harassed to the point that he was constructively discharged.

> For these reasons, I find that there is reasonable cause to believe the Respondent discriminated against the Charging Party because of his disability in violation of the ADA by denying him a reasonable accommodation and subjecting him to harassment because of his request for a reasonable accommodation, resulting in his constructive discharge. (App. 0098)

Defendant asserts in its Motion for Summary Judgment that they were "deprived" from information about Charging Party's disability and EEOC's findings on harassment and

constructive discharge. Actually, the Respondent was provided information throughout the process, including in (a) EEOC's Letter of Determination (App.0098-0099), (b) a Pre-Determination Interview with EEOC Investigator Jessie Moreno on April 26, 2021 (App. 0101) and (c) a letter from EEOC Trial Attorney Joel Clark on June 10, 2021. (App. 0102-0103)

Therefore, the evidence, when viewed in the light most favorable to the EEOC does not support the granting of summary judgment on the issue of exhaustion of administrative remedies.

## B.  DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON HARASSMENT

In its Motion for Summary Judgment, Defendant argues that it is entitled to summary judgment on EEOC's complaint that the Defendant violated the ADA by subjecting the Charging Party to harassment because of his disability. [1]

To establish an ADA hostile work environment claim in the 5th Circuit, each claimant must show: (1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment complained of was based on her disability or disabilities; (4) that the harassment complained of affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt, remedial action. *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 235–36 (5th Cir. 2001) (*quoting McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 563 (5th Cir. 1998)).

In this case, David Calzada was subjected to harassment by his supervisors Manager Ana Navarette and Steve Mosher, the Pharmacist in Charge for Fabens.[2] The deposition evidence establishes that Mosher had hiring responsibilities: he and Navarette interviewed applicants and

---

[1] A cause of action for disability-based harassment is "modeled after the similar claim under Title VII." *McConathy v. Dr. Pepper/Seven Up Corp.,* 131 F.3d 558, 563 (5th Cir.1998). The same substantive legal standards and evidentiary framework apply to claims under either statute. *See Miller v. Pub. Storage Mgmt., Inc.*, 121 F.3d 215, 218 (5th Cir. 1997) (recognizing that "the ADA is part of the same broad remedial framework as ... Title VII, and that all the anti-discrimination acts have been subjected to similar analysis").
[2] Texas Administrative Code provides that Pharmacist Techs and Trainees are under the direct supervision of the Pharmacist in Charge. (App. X, US Drug Mart 000092-96)

**EEOC'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** 9

decided together who should be hired for the Clerk and Pharmacy Tech and Pharmacy Trainee positions. (App. 0040-0041) Mosher and Navarette both trained Calzada. (App. 0047) Mosher writes performance evaluations for Pharmacy Technicians.  (App. 0024A) Mosher also had responsibility for discipling employees. Navarette noted that Mosher had to sign every disciplinary write-up. (App. 0043-0044) Calzada, Primero and Navarette also testified that Mosher directly supervised the Pharmacy Techs and Tech Trainees. (App.0059) Chief Operating Officer David Paschal testified that as Pharmacist in Charge, "the entire practice of pharmacy within the location comes under him (Mosher)." (App. 0065) Senior Pharmacy Tech Robert Primero testified that as the Pharmacist in Charge, Mosher was the person with "the ultimate authority" at Fabens Pharmacy. (App. 0073A)

   "Harassment affects a 'term, condition, or privilege of employment' if it is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Hernandez v. Yellow Transp., Inc.,* 670 F.3d 644, 651 (5th Cir. 2012) (*quoting Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)). More, the alleged harassment must have created a work environment that would have been perceived as hostile or abusive by a reasonable employee. *Credeur v. Louisiana Through Office of Attorney Gen.,* 860 F.3d 785, 797 (5th Cir. 2017); *Septimus v. Univ. of Houston*, 399 F.3d 601, 611 (5th Cir. 2005) (Title VII). In determining whether the work environment is hostile, this Court examines the totality of circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. (*quoting Ramsey*, 286 F.3d at 268)

   David Calzada was hired as a Clerk by Fabens Pharmacy in August 2018. His primary job duties were to help customers with their prescriptions. He took customer prescription orders,

helped customers with pharmacy consultations, and worked with doctor's offices to make

prescription arrangements. Calzada has asthma. He was diagnosed with asthma when he was

about 7 or 8 years old. At the time he worked at Fabens, Calzada used albuterol sulfate and an

inhaler to control the asthma symptoms, such as difficulty breathing, pain and pressure in his

chest, shortness of breath and wheezing when exercising. (App. 0003-0005, 0008-0010)

Calzada made Respondent aware of his disability from the onset of his employment in

August 2018. Calzada testified that during his interview with Ana Navarette and Steve Mosher,

they asked about his medical history and he told them that he had asthma. (App. 0007A)

[3]Calzada testified that he uses an albuterol inhaler and recalls using it at Fabens. He testified that

lifting the boxes of over-the-counter medication and exercise would lead him to use the inhaler at

Fabens (App. 0008). He specifically remembers one time that he was handling multiple patients

and "running around" to talk to the Pharmacy Tech and Pharmacist. He started feeling shortness

of breath and wheezing, so he had to use the inhaler, which was then kept in his bag. He told the

other clerk that he had to go use his inhaler. (App. 0010). Calzada testified that when he had to

use his inhaler at work, he told Navarette. (App. 0010A) Other employees saw Calzada use his

inhaler in the Fabens Pharmacy. Co-worker Bernice Rodriguez testified through affidavit that

she knew Calzada had asthma and that he used a Pro Air Inhaler. She said the employees talked

about his asthma and his using the inhaler after a time that he exhibited symptoms on the job.

(App. X Affidavit of Rodriguez) David Paschal also testified that during an interview he

conducted after receipt of Calzada's EEOC Charge of Discrimination, he interviewed Sonya

Aguirre, Bookkeeper, who told Paschal that she recalls that Calzada had shown his asthma

---

[3] While Navarette admitted that during interviews she asks applicants if they have any disabilities and need any accommodation, she denied that Calzada told her that he had asthma during the interview. (App. X, Navarette deposition, p. 22, 25)

inhaler to both Ms. Aguirre and Ms. Navarette.  (App. 0070)

The harassment complained of in this case involves the meeting held between Calzada, Navarette and Mosher on March 30, 2020. Mosher testified that purpose of the meeting was to discuss Calzada's request to wear a face mask. (App. 0026) During the meeting, Calzada tells Navarette and Mosher that he is "asthmatic" (App. 0028)(App. 0089) Specifically, Calzada says: "I'm asthmatic. This whole thing, if I get it, inflammation in the lungs, and that's it for me." (App. 0089) During this meeting, Calzada was subjected to severe comments, threats, and demeaning name-calling and insults from Mosher and Navarette. The harassment was severe, and it was because of his disability as evidenced with examples presented herein below.

The transcription of the meeting (App. 0079-0096) reveals that Navarrete and Mosher both told Calzada that he was not allowed to wear a mask because of Defendant's prohibition on mask wearing. And, Calzada was threatened with termination multiple times during the meeting after Calzada insisted that he wanted to wear the mask to protect himself because of his disability. The recording and transcript demonstrate that Mosher unquestionably displays a hostile and belittling attitude towards the Calzada following his request for the accommodation of a facemask.  Among the notable comments from the confrontation between Calzada, Mosher, and Navarrete:

- Navarrete states that the reason Calzada could not wear a facemask was because COO Paschal disallowed the employees from wearing masks unless there was a case of COVID-19 in the pharmacy. She states: "So, David said not to wear a mask unless there was a case there or whatever." (pg. 3)
- Calzada had previously raised a concern that a pharmacy customer had presented with possible COVID-19 symptoms. Although Navarrete dismissed the concerns, Calzada identified the customer's COVID-19 symptoms, including a fever and body aches (pg. 3)
- Calzada notes that he is at risk of infection because Defendant had not adopted the COVID-19 protocol of wearing facemasks at the workplace. He specifically notes that he comes into contact with customers, thereby being exposing to the risk of coronavirus infection. (pg. 5)

**EEOC'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** 12

- After Calzada makes these points, Mosher immediately starts to berate him for his "complete lack of respect" towards a supervisor. (pg. 5)
- Prior to the conversation on the recording, Calzada had requested to wear a facemask. Navarrete asks Calzada why he had "that attitude." (pg. 5-6)
- Calzada replied that the facemask was worn for his own protection, adding that he can't afford to get the virus. (pg. 6)
- Mosher angrily replies: "But you're not going to come in here where you work and tell your boss what you're going to do… <u>I'd have sent you packing, and you'd never come back</u>." (pg. 6)
- Navarrete then tells Calzada that his attitude was "disrespectful." Calzada replied, "I felt disrespected to the fact that I don't feel like I'm being protected here. If I can't wear a mask and I bring this [COVID-19] home, that's it for me."
- Navarrete and Mosher both warned Calzada that he couldn't "enforce" the wearing of a mask. (pg. 7)
- Calzada replied that he wasn't trying to enforce anything; he was simply trying to wear a mask. (pg. 7)
- To this, Mosher said: "You need to learn there's an attitude that comes from you that needs to be disciplined and controlled. We know that you're acting like a little kid, but we're not going to put up with it." He goes on: "Thing is, you're going to be treated like a little kid when you act like a little kid towards us." (pg. 7)
- Mosher continues: "You never go to your employer and tell them, basically, I don't care what you say. I'm doing whatever I want. That's what little kids do, and <u>they usually get locked in their rooms for a while or even spanked</u> …" (pg. 7-8)
- Mosher didn't stop there, adding: "You didn't ask; you didn't suggest. But if you were adamant about it. <u>Your choice is to say, Okay, I won't wear it. I'll go home; I'll quit.</u> And if you had done that, it would have been a totally different situation. But you didn't do that." (pg. 8)
- Calzada begins to say that when it comes to his protection, he would – and at that point Mosher, clearly angry and frustrated, interrupts Charging Party, "<u>Your only choice was just like I said. You be respectful and you say, okay. Well, then I'm going to have to go home. I'll quit. That was your only other choice.</u> You didn't have the right choice of saying I'm going to work here, and I'm going to wear a mask…. You had the other choice that you didn't think about, and that was to say, well, then, I guess I better quit. If you won't let me protect myself, then I'll have to quit."  (pg. 8)
- By this point, the audio recording reveals that Calzada is in tears, and he attempts to respond. But, Mosher angrily cuts him off and begins cursing. "You didn't give a *damn* about your employer or anything they said. And, you know what?  I would <u>still fire your ass right now</u>, but it's not up to me. It's up to her [Navarrete], "I mean, <u>you're a disrespectful, stupid little kid</u>. And I don't care if you got a recorder on. I don't care who you play that back to. I'm right, and <u>you're stupid as you can be</u>." (pg. 9)
- Calzada then states: "I'm going to pick whatever I deem necessary. If I need to be protected, I'm going to take that right." (pg. 9)
- Mosher replies: "<u>Your protection is to walk out that door and never come back</u>. You don't have to come in here and wear a mask. That's obviously something that scares you to death, so why are you even here now?" (pg. 9-10)

- As the meeting goes on, Calzada very clearly identifies his disability and expresses his health concerns: "<u>I'm asthmatic. This whole thing, if I get it, inflammation in the lungs, that's it for me</u>." (pg. 11)
- Calzada then explains why he left the workday prior: "You left me no choice. You told me to either walk out or come back here and work without a mask. So I took what I thought was necessary." (pg. 11)
- Navarrete responds: "There are other ways to go about it, David," to which Calzada replies, "I tried going around those ways, and you told me, I spoke to David [Paschal] and he didn't allow it." (pg. 11)
- Navarrete then says: "No, he didn't allow it. He did not allow it. He really didn't allow it. That's why I couldn't have anybody wear a mask. He would not allow it."
- As the meeting progresses, Navarrete launches into a strained argument that by wearing a facemask, Calzada was engaging into "hysterical" behavior: "If I go into a hysteria, we are in – in a place where we have to help people. It's helping people. If we stay calm, we keep them calm. If we go into a panic, guess what? We're going to start hysteria in here." (pg. 13)
- As the meeting continues, Navarrete argued that Calzada's attitude was a problem due to his insistence on wearing a facemask. To this, Calzada states: "I tried to show him in the morning I brought it [a facemask] in the morning. And you even said no, you're not allowed to wear it. There's no communication; there was nothing." (pg. 14)
- Navarrete replies: "Yes, because David [Paschal] still had an order of not wearing it. I'm only – I only did and followed rules by my superior, by the owner." (pg. 14-15)
- The meeting concludes by Navarrete asking Calzada how to move forward. Calzada replies that he would like to feel protected.

During her deposition in the case, Navarette agreed that the transcript was accurate and similar to what she remembered about the argument between Navarette, Mosher and Calzada. (App. 0053A) Mosher testified that he recognizes his voice on the recording. (App. 0027) Senior Pharmacy Tech Robert Primero testified that he could recognized the voices of Navarette, Mosher and Calzada on the audio recording of the argument. (App. 0034A)

When taking into account the "totality of the circumstances" in the light most favorable to the EEOC, the comments by Calzada's supervisors meet the standard of being sufficient severe to raise a genuine issue of material fact. The comments made by Mosher included *ad hominem* attacks, teasing, physical or verbal threats, and inappropriate language. Calling Calzada a "stupid little kid" and saying that he would "fire his ass" are the types of threatening and inappropriate language that create a hostile work environment. "To be actionable, the challenged

conduct must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so." *Shepherd v. Comptroller of Pub. Accounts,* 168 F.3d 871, 874 (5th Cir.1999) (citing *Harris,* 510 U.S. at 21–22, 114 S.Ct. 367). In this instance, Calzada testified that the yelling and cursing by Mosher created a scary situation for him. (App. 0018-0019) He testified that he was humiliated and degraded by what Mosher and Navarette said to him. (App. 0021A) When Calzada went home, he cried about what had happened. (App. 0021) Navarette admitted that Calzada started crying during the meeting because he was very upset during the yelling, criticism and name-calling. (App. 0051) She also admitted during her deposition that Mosher was upset and agitated during the argument. She admits that she held her hand up to Mosher to communicate that he should calm down. Navarette admits that it was not appropriate for Mosher to tell Calzada that he was acting like a disrespectful, stupid kid. She agrees that Mosher should have exercised greater control. (App. 0052-0053) Even Mosher admits that he was more threatening than Calzada and that he was frustrated (App. 0029,0031) [4] During his deposition, Mosher testified that he was very frustrated with Calzada and that he "said some things he should not have said." (App. 0032)

Senior Pharmacy Tech Primero testified that after listening to the audio recording of the argument, that Mosher's comments were: "Counterproductive, uncalled for, harassment." (App. 0077) Primero testified that he was shocked by how confrontational the argument was. (App 0077A) Primero also testified that "it made my skin boil" to hear Mosher's comment that Calzada was a stupid little kid. (App.0075) He described that comment as: "not good, not positive, negative, hurtful."(App. 0075) Primero later testified: "I mean, as an employee, you can

---

[4] Mosher testified during his deposition: "I raised three children, and sometimes I had to talk to them the same way I had to talk to that little child." (App. 0030)

only take so much.  I mean, I would have respectfully asked him to stop.  I would not have allowed him to continue talking to me that way." (App. 0077B)

When considering the totality of the circumstances, it is clear that Mosher and Navarette's comments during the argument at least raise a fact issue on whether the abusive comments were "severe." It is important to note that the comments were made to Calzada out in the open, in the back of the pharmacy. He was not taken into the office (where performance appraisals and other business actions are conducted in private). Employees were in the pharmacy at the time of this argument, they were walking into the pharmacy and clocking in while this was occurring. Also, the relative power imbalance between Calzada and Mosher contributes to the objective severity of the comments. Mosher, at 71-years-old, is the Pharmacist in Charge and the "ultimate authority" in Fabens Pharmacy. (App. 0039, App. 0073A ). Calzada, at 19-years-old is working in his first job in the medical field. Primero said that Calzada was a good kid and he looked at Calzada as "a little brother." (App. 0074) Even Mosher recognized that imbalance of power. During his deposition, Mosher admitted: "I'm a whole lot older person than he is. I have lived a whole lot more life. I should have a little more control over how I treat people. And I didn't." (App. 0033) Mosher testified that he subjected Calzada to an intimidating verbal attack that was intended to be intimidating. (App. 0035) Mosher even admitted that he violated U.S. Drug Mart's Workplace Violence Prevention Policy (App. 0034)

This testimony, when viewed in the light most favorable to the EEOC, raises a fact issue on whether the harassment was sufficiently severe to create a hostile work environment.

### C. DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE ISSUE OF CONSTRUCTIVE DISCHARGE

Defendant asserts in its brief that the Court should grant summary judgment on the issue of constructive discharge. To prove that, a "'plaintiff must establish that working conditions

were so intolerable that a reasonable employee would feel compelled to resign.'" *Brown v. Kinney Shoe Co.,* 237 F.3d 556, 566 (5th Cir.2001) (quoting *Faruki v. Parsons,* 123 F.3d 315, 319 (5th Cir.1997))*.* The imposition of intolerable working conditions need not be with the purpose of forcing the resignation. *Bourque v. Powell Elec. Mfg. Co.,* 617 F.2d 61, 65 (5th Cir. 1980). Here, the facts show that Calzada was subjected to an abusive, hostile confrontation with his supervisors. They yelled at him, cursed at him, humiliated him and degraded him out in the open area of the pharmacy. And they did this because he requested to wear a facemask to avoid the possible complications of COVID on his underlying condition of asthma. Mosher admitted that his verbal attacks of Calzada violated the workplace violence policy and were intended to be intimidating. (App. 0034-0035)

Towards the end of the argument, Navarette asks Calzada how they can move forward after this. Calzada responds by saying: "By being sure that I am protected – that I feel protected in this environment would be nice." (App. 0094)

After the meeting that was held on Mar. 30, 2020, Calzada went back to his duties and responsibilities at the pharmacy. He testifies that after the conversation, he just tried to keep his head down and avoid the subject of what had just happened. (App. 0018) But the more he thought about it, he thought it was "a scary-like situation." Considering he got yelled at and called names, he testified that he just tried not to increase the tension. (App. 0018-0019) He continued to work, trying to avoid Mosher. (App. 0018) Navarette recalls that Calzada returned to work. She asked him if he wanted to work through lunch because he had been off work for several days. Calzada at first said yes, but then realized he had not brought his lunch, so he asked to get something to eat. (App. 0054-0056)

Calzada then testifies that he went home and talked to his mother and father about what had just happened. (App. 0021). They told him that what had happened wasn't right. (App. 0021) Calzada said he realized that this was the first time that Mosher told him that he would "fire his ass." (App. 0020) He went back into the pharmacy and picked up his personal effects and left. (App. 0055) Navarette eventually called his house that day but spoke to Calzada's mother who said he would not be coming back. (App. 0056) Navarette never spoke to Calzada after that day. She never conducted an Exit Interview as is required by the Defendant's policy (App. 0056) Mosher never spoke to Calzada after that day. Mosher never apologized to him. (App. 0057)  In its Motion for Summary Judgment, Defendant asserts that the terms and conditions of Calzada's employment did not change after this confrontation with his supervisors. That is not consistent with the facts and witness testimony in this case. After this confrontation occurred at approximately 9:30 a.m., Calzada cried, picked himself back up and tried to go back to work. But Calzada was able to stay at work for only three more hours before he was compelled to leave without any further comment. There is no doubt that Calzada left this job because of the harassment by Mosher and Navarette. EEOC requests that this Court allow the jury to judge the credibility of the witnesses and assign weight to the testimony. Given the testimony of the witnesses in this case, EEOC asserts that there is sufficient evidence to go to the jury on the issue of constructive discharge.

### D. DEFENDANT CANNOT PROVE THAT IT EXERCISED REASONABLE CARE TO PREVENT AND CORRECT OR REMEDY HARASSMENT

Defendant is unable to meet its burden of showing that it is entitled to summary judgment as a matter of law on whether the employer exercised reasonable care to prevent and correct any harassing behavior. *Vance v. Ball State Unv.*, 570 U.S. 421, 453 (2013). To show a reporting policy establishes reasonable care, an employer must show "it installed a readily accessible and

effective policy for reporting and resolving complaints" of harassment." *Pa. State Police v. Suders,* 542 U.S. 129, 134 (2004). In this case, Defendant does not have an effective policy and complaint procedure on the issue of disability discrimination. Paschal, USMD's Chief Operating Officer, testified that there is no anti-discrimination policy contained in the Employee Handbook. (App. 0066, App. 0111-0128)[5] It is undisputed that the Defendant did not develop or communicate to each of its employees any explanation of rights or complaint procedure relating to reasonable accommodation or the ADA. There is no explanation of how to request a reasonable accommodation. (App. 0111-0128) Navarette, the Pharmacy Manager, corroborated that she has not provided any training on the ADA to the employees. (App. 0058) Notably, Mosher, the Pharmacist in Charge, could offer nothing more than an over-simplistic description of his understanding of what is prohibited by the ADA: "Well, you don't not hire somebody because of a disability and you don't fire somebody because of a disability." (App. 0025)

Defendant failed to provide a "proven, effective mechanism for reporting and resolving complaints" of harassment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998) A harassment policy is considered ineffective when the company fails to provide supervisors with "any guidance regarding how to investigate, document, and resolve harassment complaints once they were reported." *EEOC v. Boh Bros.Const.,* 731 F.3d 444,464 (5th Cir. 2013). In its brief, Defendant argues that it should be excused from the harassment because after Mosher's verbal attacks and intimidation during the meeting, his wife Ana Navarette gave him management tips to read. This is not sufficient to prevent and correct discrimination under the law, particularly where the harassment resulted in a tangible employment action.

---

[5] The Agreement signed by each employee upon hire contains only a general statement that the company does not condone discrimination based upon race, color, sex, age, religion, veteran's status, or disability. However, this Agreement indicates that any complaint of discrimination must be put in writing and sent to USDM headquarters in Midlothia. This Agreement (App. 0105) Employees are not provided with their own copy of this agreement.

## CONCLUSION

EEOC respectfully urges that the Court deny the Defendant's Motion for Summary

Judgment in its entirety and requests such other and further relief to which it may be entitled.


Respectfully Submitted,

ROBERT A. CANINO
REGIONAL ATTORNEY
Oklahoma Bar No. 011782


/s/ Suzanne M. Anderson
SUZANNE M. ANDERSON
Supervisory Trial Attorney
Texas Bar No. 14009470

EQUAL EMPLOYMENT OPP. CMSN
207 S. Houston Street, 3rd floor
Dallas, Texas 75202

(972) 918-3626
(214) 253-2749 FAX

suzanne.anderson@eeoc.gov


CERTIFICATE OF SERVICE

This is to certify that on this, the 27th day of June, 2022, I electronically transmitted the attached

document to the Clerk of the Court using the ECF system of filing, which will transmit a Notice

of the Electronic Filing to Defendant's counsel, an ECF registrant


/s/ Suzanne M. Anderson
SUZANNE M. ANDERSON


**EEOC'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** 20